## Case No. 8,628.

### LYMAN v. LYMAN et al.

[2 Paine, 11.] [1]

Circuit Court, D. Vermont. Oct. Term, 1829.

GENERAL AND UNLIMITED PARTNERSHIP — PARTNERSHIP TRANSACTIONS — JOINT FUNDS — REAL PROPERTY — LEGACY — WILL — CONSTRUCTION — PAROL EVIDENCE — HUSBAND AND WIFE — FAMILY EXPENSES — DISSOLUTION OF PARTNERSHIP — ACCOUNTING — CONTRACT TO MAKE A WILL — RESCISSION — COMPENSATION FOR IMPROVEMENTS AFTER DISSOLUTION OF PARTNERSHIP — COMPENSATION FOR PARTNER'S SERVICES.

1. Two brothers, in 1784, entered into copartnership without any agreement in writing, the principal object of which at first was to carry on the business of trade and merchandise, and boating on the Connecticut river. It was understood between them that all their property was to be in common, and that each should be at liberty, on joint account, to do any kind of business, make any contracts, or enter into any speculation at his discretion. This partnership lasted until 1820, and during the period of its continuance, one brother, who had a numerous family, resided in Vermont, and the other, who had no children, in Connecticut, and the family expenses of both were defrayed out of the joint funds, no account whatever being kept of them, and no partnership account having been kept or settled during the whole period. As the capital and means of the brothers increased their business was extended, and they entered into navigation at large, and each imported goods, built, purchased and sold vessels, purchased land in different states, turnpike and toll-bridge shares, and built bridges and took the deeds and evidences of title to both or either, as he pleased. In the absence of any written agreement between the parties, or any verbal contract with respect to the extent of the copartnership and share, the nature of their connexion was to be collected from the course of their business, their casual declarations, and occasional letters and ratifications of each other's previous acts. It was *held* to be impracticable to draw any line or set any fixed limits to the partnership that would do equal justice to the parties, but that the partnership must be considered as general and unlimited, and all their property of every description as held in common, and that the separate acts of one, however ill judged, disastrous and unsatisfactory to the other, if done in good faith, were partnership transactions.

2. Where a lot of ground belonged to one of the partners before the commencement of the partnership, but buildings were afterwards erected upon it with the joint funds, of much greater value than the lot, and the proceeds of the property when sold were applied to the uses of the firm without objection, the whole was *held* to belong to the partnership.

3. At an early period in the partnership one partner received a large legacy under the will of a third person, and without the knowledge of the other partner applied it to the use of the partnership; *held*, that as everything was intended to be held in common, and after such a lapse of time, all individual interest in the legacy was to be considered as abandoned.

4. Whether one partner has a claim upon the firm for private funds put into the concern without the knowledge of his copartners. Quaere.

5. Parol evidence of an intent on the part of the testator that the bequest should be for the

[1] [Reported by Elijah Paine, Jr., Esq.] .

joint benefit of both brothers, rejected; no such intent appearing from the will.

6. Another legacy left to the wife of a partner was for the same reasons *held* to belong to the joint property, as when received it became the property of the husband.

7. The understanding that no charge was to be made for family expenses was *held* to extend to the expenses of the children while minors and members of the family, as the parent might command their services, but not to advances made them after they became of age.

8. Salaries paid to the children, after they became of age, as clerks, *held* to be a charge against the partnership.

9. Lands bought by a commercial partnership, for the partnership purposes, are considered, in equity, as forming part of the partnership fund and stock in trade, and standing on the same footing as the personal property, particularly during the lives of the partners; and in a court of equity, it is immaterial whether the title is vested in one or both of the partners, for it considers the partner having the legal title, as a trustee for those beneficially interested.

10. There was evidence that, in 1814, one of the brothers wished to dissolve the partnership, but agreed to continue it on the other promising to make a will in favor of himself and family; that the will was made and afterwards destroyed, and that for this reason the brother in whose favor it was made in 1820 dissolved the partnership without the other's consent; and it was *held*, that the destruction of the will did not justify the dissolution of the copartnership, but that the dissolution was a rescinding of the contract by one brother, which liberated the other from any obligation to make the will.

11. Whether such a contract to make a will would have been enforced if it had not been rescinded. Quaere.

12. The defendant insisted that the real estate should be divided by allowing each party to retain what stood in his name and was in his possession at the time of the dissolution, at its then valuation; and if there was a balance, crediting it to the party entitled to it. But the court *held* that a partner is always entitled to have the partnership wound up by a sale of all the property, as the best mode of ascertaining its value.

13. The prayer of the bill was for an account, and that the joint fund be divided between the parties, and for general relief; but that a sale of the property was included in the prayer for general relief, and not inconsistent with the specific relief prayed.

14. It was contended that the court could not enforce an order of sale, except of the lands lying within the district; but *held* that the order would not require the agency of any officer out of the jurisdiction of the court; that it was to act only on the parties; and that the powers of the court were amply sufficient to direct a public sale of the land, and to compel the parties to convey the title accordingly.

15. The property in separate portions had remained, by tacit consent, eight years after the dissolution, in the possession of the different parties, and each had made valuable improvements on the part in his possession, and it was referred to commissioners to ascertain and report the value of such improvements, to be allowed to the party making them.

16. But this was done only from the extraordinary character of the case, which would not admit of the application of rules by which ordinary partnerships are settled, one of which was admitted to be, that one partner could not call upon the other for compensation for improvements made after the dissolution.

17. A partner is not entitled to compensation for his services, except by special agreement;

and the same rule applies after a dissolution. Each partner then becomes, with respect to the property in his hands, a trustee for the other; and it is well settled that a voluntary trustee is not entitled to compensation for personal services, but only for actual charges and expenses.

18. The costs directed to be made out before any decree should be made as to costs.

In equity.

THOMPSON, Circuit Justice. The general object of the bill filed in this cause was to have an account and settlement of a partnership concern, which had existed between Justin and Elias Lyman for twenty-five years and upwards, the transactions of which have been very extended and multifarious, and are involved in great obscurity for the want of proper books and accounts with respect to some part of the concerns, and, indeed, an entire want of any accounts as to some matters which have been drawn under examination; and all this embarrassment much increased by the want of any articles of partnership, or any satisfactory evidence showing a definite contract or understanding between the parties as to the nature and extent of the partnership. Under such complicated difficulties, heightened, we are sorry to say, by the acrimony with which the controversy has been carried on, it is hardly to be expected that exact justice can be done, or entire satisfaction given to the parties. The conclusions, however, to which we have arrived, are the result of our best judgment, after an attentive and laborious consideration of the case. The bill as to Wyllis Lyman has been dismissed by consent of parties, reserving the question of costs; and the commissioners find no account whatever between the complainant and Elias Lyman, Jr. The bill as to him must also be dismissed, and the question of costs is reserved. Elias Lyman and Lewis Lyman have put in separate answers, and testimony has been taken and submitted to commissioners appointed by the court. And the cause now comes before the court upon numerous exceptions taken to the report of the commissioners by the respective parties, which we will proceed to consider.

The first exception taken by Elias Lyman to the report of the commissioners relates to the nature and extent of the partnership. The commissioners have reported, that as early as the year 1795, Justin and Elias entered into partnership, and that all the property that they or either of them then owned was understood to be common between them, under an agreement or understanding between them that each one should be at liberty to do any kind of business, make any contracts, or enter into any speculation at his discretion, and that this general and unrestricted partnership continued until the 22d of January, 1820, when it was dissolved by Elias, without the consent of Justin. The nature and extent of the partnership is not defined by any articles of copartnership, but is to be collected from the acts and declarations of

the parties, and the course of business which has in fact been carried on by them.[2] It would seem a little extraordinary that a partnership of so unlimited and undefined a character should be entered into between any parties; and its continuance in this case is only to be accounted for from the relationship of the parties, and some peculiar circumstances with respect to the final disposition of the property of one of the partners, he having no children to inherit it, and the understanding and expectation that the whole would inure to the benefit of the family of the other. It is not to be expected but that a partnership concern for such a length of time, and so loosely conducted, will be involved in doubt and difficulty; and if exact justice shall not be meted out to the parties, the fault will rest upon themselves for having involved their transactions in so much obscurity. It would be a useless undertaking to go through a minute detail of the various circumstances which have attended the course of business between these parties, and from which the nature of their connection is to be collected. All that is deemed necessary is to state generally the conclusion to which we have arrived from an attentive examination of the proofs.

The bill alleges the partnership to have been one of the most general description, extending to all business of every kind, into which either of the parties chose to embark, the principal object of which, at the commencement, was to carry on the business of trade and merchandise, and the boating business upon the Connecticut river. But as their capital and means increased, their business was extended, and that they entered into navigation at large, imported goods, built, purchased and sold vessels, and entered into and pursued any sort of trade and merchandise, and other business, at discretion. That the partners, being located at different places, each partner purchased land, turnpike shares, built bridges, purchased shares in toll-bridges, and purchased and sold any kind of estate whatever at pleasure, and paid out of the funds of the partnership, and took the deeds or other evidences of title to both or either of the said partners, as convenience or other motive might require; and that during all the time of the existence of the partnership, there were never any articles of partnership in writing expressive of the terms thereof, nor did either of the partners keep any account of family or personal expenses, but all such were paid out of the joint funds. The defendant, Elias Lyman, admits there never were any written articles of copartnership, but does not undertake to set out or define the nature or extent of the partnership. He alleges, that as early as the year 1784, he and his brother Justin

---

[2] General reputation of a partnership, existing between two or more individuals, standing alone and not offered in corroboration of facts and circumstances, is inadmissible in evidence to prove a partnership. Halliday v. McDougall, 20 Wend. 81, 22 Wend. 264; Smith v. Griffith, 3 Hill, 333. See McPherson v. Rathbone, 11 Wend. 96; Whitney v. Sterling, 14 Johns. 215. In an action against several as partners, one of the defendants is brought into court; he alone is brought into court; the plaintiff is entitled to recover, if he shows that this defendant is a member of the firm. It is not necessary in such case to prove that the other defendants were members of the firm. Halliday v. McDougall, 22 Wend. 264, reversing the decision of the supreme court, 20 Wend. 81. Where a note or bill is payable to a firm, strict proof is required that the firm consists of the plaintiffs on the record. McGregor v. Cleveland, 5 Wend. 475. The declarations of one of several partners cannot be given in evidence to prove a partnership; they are testimony only against the party making them. McPherson v. Rathbone, 7 Wend. 216. Where two or more are charged as partners, articles of agreement between them are admissible in evidence, (although not conclusive,) for the purpose of showing what the true nature of the connection between the parties was at the time it commenced; but their declarations made at a subsequent period, would not be admissible. Mitchell v. Roulstone, 2 Hall, 351. In the absence of all proof to the contrary, partners will be presumed to be equally interested in the partnership funds. Gould v. Gould, 6 Wend. 263. In an action against the administrators of a deceased partner, the surviving partner is a competent witness to prove the partnership. Grant v. Shurtel. 1 Wend. 148. A witness, a commission merchant in New York, testified that he had become acquainted with, and did much business for a merchant in Antigua, and understood, in the course of his business, and from general report, that he was a partner in a house

or firm in London, on whom he had drawn a bill of exchange, though the witness had not known or heard of the drawer or drawee until more than six months after the bill was drawn; held, that this was sufficient evidence prima facie, to show that the drawer of the bill was a partner in such firm. Gowan v. Jackson, 20 Johns. 176. Two persons signing a joint note, is no evidence of a partnership between them. Hopkins v. Smith, 11 Johns. 161. If B. and C. have acknowledged the existence of articles of copartnership between them and A., which, upon due notice, they refuse to produce at the trial, the jury may reasonably infer that if produced, they would have shown the fact of partnership. Whitney v. Sterling, 14 Johns. 215. But the mere acknowledgment of B. and C., that A. was their partner, is not sufficient to bind him. Id. In an action against A., B. and C., as secret partners, the declarations and acts of A., though evidence to show that he considered himself a secret partner with B. and C., are not admissible directly to charge or implicate B. as a partner. Whitney v. Ferris, 10 Johns. 66. In an action of assumpsit against A. and B., as partners. they pleaded that the promise, if any, was made by A. and B. jointly, with one C. and not by A. and B.. &c. Held, that the declarations of A. and B., or of C., were not admissible evidence in support of the plea. Sweeting v. Turner, Id. 216. A. and B. are partners in one concern, under the firm of A. & Co., and A. is also a partner with C. in a distinct concern. A. & Co. drew a bill of exchange on C., who refuses to accept it; in an action against A. & Co., as drawers of the bill, a promise by C., after he had been arrested, to pay it, is not evidence that he was a partner with A. in the firm of A. & Co. Bogert v. Lingo, 3 Caines. 92. The existence of a partnership, the firm of the partnership, and whether a note was given on a partnership transaction, are facts which may be left to the jury to infer from the evidence. Drake v. Elwyn, 1 Caines, 184.

commenced the boating business on the Connecticut river as partners, and continued that business until the year 1794, a part of which time they were connected with one Masten in the business. That about the time last mentioned, they began to enlarge and extend their business of boating; and soon after, and by slow degrees, commenced and carried on the regular business of merchandise in the name and under the firm of Justin & Elias Lyman. He denies that he ever, on his part, entered into any speculation out of the ordinary course of their boating and mercantile business, without the knowledge, approbation and consent of Justin prior to the year 1814, this being the time when the contract is alleged to have been entered into respecting the will of Justin; and he denies that by any contract, either express or implied, the said partners were at liberty to enter into any sort of trade and speculation at discretion, out of their ordinary concerns of boating and regular mercantile transactions, or that they ever did so except the unauthorized and unwarrantable speculations of Justin, set out in the answer, and some transactions of his own subsequent to the contract in June, 1814, respecting the will. The answer is very far from defining with certainty and precision the nature and extent of the partnership even in the understanding of the defendant Elias. It is difficult to comprehend what is meant by the term "regular mercantile transactions," as used in the answer. And it is admitted by defendant's counsel, that the partnership extended to every transaction which had the assent of both parties; and that in all the contracts and dealings of each, both are bound as to third parties. And Elias only seeks to throw upon Justin the loss in cases which were such a gross diversion of the partnership fund, that the consent of Elias could never be presumed to the transaction. Admitting the partnership was in some measure limited, under the modification contended for, we are not aware of any one transaction that would not be embraced within it. It has not been pretended that there was any actual fraud committed by Justin. The utmost extent of the charges against him are the want of judgment and discretion, by reason of which he embarked in some wild and extravagant speculations. And although, in many instances, when Elias first came to the knowledge of them, he was dissatisfied, yet he always finally aided and assisted in carrying the contracts into execution, by applying the partnership funds in his hands to that purpose: and whether his consent was previously given, or the transaction subsequently ratified, was immaterial; in either case, he became a party to it. In the absence of any written agreement between the parties, or any verbal contract with respect to the extent of the partnership, and where the nature of the connection between them is to be collected from the course of their business, their casual declarations and occasional letters, it is utterly impracticable to draw the line or set any fixed limits to the partnership that would do equal justice to the parties. To consider every transaction which Elias might have disapproved of, as out of the partnership, and thereby throw all the losses upon Justin, would be inequitable, and not warranted by any fair construction of the course of dealing between the parties. It is a much more reasonable, as well as equitable conclusion, to consider the partnership general and unlimited, and that all their property of every description was held in common.[3] If the conduct of either party was such as not to meet the approbation of the other, it was within his power at any time

---

[3] Two partners being by agreement equal in interest, are each bound to contribute an equal share of the advances required, but one falls short and the other makes up the deficiency. The defaulting partner sells out his interest to a stranger, and the other unites with the purchaser in releasing the retiring partner. Held, that the release extends to all claims which the continuing partner had upon the retiring partner on account of the inequalities of their advances; for when two or more are equal partners, and one furnishes more than his share of the funds for the use of the firm, the excess constitutes a debt due by the firm, not by the other partner, to him who made the advances; and if one fails to contribute his due share, the deficit is a debt due by him individually to the firm. Conwell v. Sandidge's Adm'r, 5 Dana, 212. A. agreed to give his notes for a certain sum to B., for half of B.'s stock in trade, the two to be partners thereafter. B. believing that A. could execute the notes at any time, suffered him to act as a partner, to buy and sell goods in the partnership name; but A. failed to execute the notes for his share of the stock, and advanced no money to the concern. Held, that the delivery of the notes was a condition precedent, and that no partnership existed until A. complied with it. McGraw v. Pulling, 1 Freem. Ch. [Miss.] 357. If a partnership be established, it is prima facie one of equal interests. Reybold v. Dodd's Adm'r, 1 Harr. [Del.] 401. In the state of New York, no written articles are necessary to constitute a copartnership which is to take effect immediately; although a written agreement may be necessary to bind the parties to enter into a future copartnership which is not to commence until after the expiration of a year. Smith v. Tarlton, 2 Barb. Ch. 336. But even where there is a parol agreement to enter into a copartnership at a future day, and specifying the terms of such copartnership, it seems that if the parties go into copartnership at the prescribed time, without agreeing upon any new terms, the former parol agreement will be presumed to constitute the terms upon which such copartnership was entered into and carried on. Id. A copartnership which is entered into and commenced immediately is not invalid, although one of the declared objects of the copartnership is to purchase real estate for the purposes of the firm, and as a site for the transaction of its business. Smith v. Tarlton, 2 Barb. Ch. 336. A person cannot claim to be a member of a partnership composed of a number of persons, unless all the persons composing said firm have agreed to accept him as such. Channel v. Fassitt, 16 Ohio, 166. Equity often declares partnerships utterly void in case of fraud, imposition and oppression, in the original agreement; or decrees a dissolution of partnership unobjectionable in its origin, but which subsequent causes have rendered onerous and oppressive. Howell v. Harvey, 5 Ark. 270. Persons who

to have put an end to the partnership. We think the evidence in the cause will admit of no other conclusion than that the parties intended a partnership or connection in business of the most unlimited character; and it is of little importance whether it commenced in the year 1784, as contended by Elias, or whether in 1795, as contended by Justin. They began with little or no property, and their business, in its origin, was confined to the boating business on the Connecticut river; but as their means increased, their business was extended to other objects, and in the end branched out in a very extended manner, embracing a vast variety of concerns that certainly could not fall within the ordinary understanding of regular mercan-

subscribe for shares in joint stock companies and pay deposits, but do not comply with the full conditions of the association, and never become entitled to profits, are not liable for debts unless they are active in contracting them, or hold themselves out as partners. The same principle will apply, as far as it can, to a suggested limited partnership not carried through. West Point Foundry Ass'n v. Brown, 3 Edw. Ch. 289. It would seem, that there can be a limited partnership in the running of a steamboat. Id. Where a feme covert entered into a written agreement with her son to form a copartnership in fact, and for a continuance of the same for a period beyond the death of the husband of such feme covert, and such copartnership commenced under such written agreement, during the coverture of such feme covert, and continued after the death of her husband for upwards of six years to the time of her own death. Held, that such copartnership related back to the time of the execution of such written agreement, so as to give both parties the same benefit which they would have been entitled to if the feme covert had not been married when the copartnership originally commenced. Everit v. Watts, 10 Paige, 82. It is a general rule, applicable especially to cases of a single adventure, when the capital of one party is money, and the other personal services, they are not partners inter se in the technical sense, merely because they had a mutual interest in the profits, nothing else appearing. In such cases, he whose capital is service is not liable for any part of the money capital of the other lost in the adventure. Heran v. Hall, 1 B. Mon. 159. A new member cannot be admitted into a partnership without the consent of all the partners. Mathewson v. Clarke, 6 How. [47 U. S.] 122. But a partner may assign his interest in the partnership to another, who, after the expiration or dissolution of the partnership, may maintain a bill for his share of the profits. Id. A partnership as to third persons may arise by mere operation of law, and without the intention of the several parties thereto. Hazard v. Hazard [Case No. 6,279]. The actual intention of the parties will alone constitute a partnership between themselves. Id. If two persons agree that one of them shall, as compensation for his services in a particular business, receive a certain portion of the profits, without being liable for the losses of the concern, this does not, as between themselves, constitute them partners. Id. Where advances are made, and responsibilities assumed by one individual to enable another in establishing and carrying on a particular business, without benefit or advantage to accrue to the party making the advances, although there be an agreement that he shall have the control and disposition of the property acquired by the means thus furnished; this does not constitute them partners. Taylor v. Perkins, 26 Wend. 124.

tile transactions, including the purchase and sale of real as well as personal property, the title to which was sometimes taken to one or the other, or both, but with the understanding that it was for the use and benefit of both. All the acts, and declarations, and correspondence of the parties, led inevitably to this conclusion; and, indeed, the answer of Elias substantially admits the same thing: and declarations made by Elias and Justin, as proved by a number of witnesses, puts the question beyond a doubt that everything was understood to be held in common: and the real estate must, in this respect, stand upon the same footing as the personal. And in a court of equity, it is immaterial whether the legal title is vested in one or both the partners; for, in such case, a court of equity will consider the party having the legal title as a trustee for those beneficially interested. Lands, therefore, bought by a commercial partnership for the purpose of the partnership concern, are considered in equity as forming a part of the partnership fund and stock in trade, particularly during the lives of the partners. This is the settled doctrine of chancery, and has not, indeed, been drawn in question by the defendants' counsel.

2. This view of the connection in business between these parties will have an important bearing upon many of the items which have been drawn into discussion on the hearing of this cause. It may be proper here, before noticing the particular items of dispute, to dispose of the question in relation to the will of Justin Lyman. This has probably been the source of most, if not all, the unpleasant controversy that has arisen between these brothers. Much evidence, as well oral as that which is to be collected from the correspondence between the parties, has been taken, to show that in the year 1814 the partnership had sustained many losses by reason of the alleged mismanagement of the business on the part of Justin. That Elias became dissatisfied, and wished a dissolution of the partnership, to which Justin was opposed. And it is set up on the part of the defendants, that in order to induce Elias to continue the partnership, an arrangement or contract was entered into by which Justin was not thereafter to take an active part in the business of the concern; and that he was, by his will, to give to Elias and his family the whole of his estate, with some small specified reservation; that such will was made, but afterwards revoked and destroyed, and which is set up on the part of Elias as the reason for dissolving the partnership. Upon the evidence taken in the cause, the commissioners have reported that no certain definite legal contract with regard to such will has been established. It is not deemed necessary to go into an examination of the evidence upon this subject; for, admitting such contract to have been made in the year 1814, as set up by the defendant Elias in his answer, it is not perceived how it can have

any effect upon the subjects of inquiry now before the court. This contract could not have worked a dissolution of the partnership; for, according to Elias' own statement in his answer, a continuance of the partnership formed a part of the contract, and, indeed, was the consideration upon which Justin promised to make a will and dispose of his property in the manner set up by Elias: and although one part of the agreement was that Justin was to withdraw from any active concern in the business, yet in point of fact he did continue to take an active part in the business of the partnership, and entered into large contracts and speculations in the name of the firm, and which Elias recognized as partnership acts, although they resulted in great losses to the company, and now form some of the most important items of complaint. Elias, with full knowledge of all this, and which, according to his own showing, was in direct violation of the agreement, still continued the partnership, and did not seek to dissolve it until the year 1820. But, independent of all these considerations, a conclusive answer to all this pretended agreement about the will is, that Elias has himself rescinded the contract on his part. There was no time fixed for this will to be made. If made by Justin at any time during his life, it would be a compliance with his agreement, and he might yet fulfil the contract on his part: he has not by any act, disqualified himself from so doing; and Elias, by recognizing and sanctioning the contracts made by Justin after the year 1814, has waived all complaints of a violation of the agreement on that ground. And yet, in the year 1820, he, in express violation of the agreement on his part, has dissolved the partnership, the continuance of which was the principal, if not the sole inducement, on the part of Justin, to make his will as set up by Elias. He having rescinded the contract on his part, there can be no possible ground on which he can claim anything from Justin on this account, and particularly as Justin has done no act to disqualify himself from fulfilling the contract on his part, if any such was ever made, and was one that could have been enforced had Elias sought to have it carried into execution, instead of rescinding it. We must, therefore, lay out of view everything in relation to this will, and consider the case entirely independent of it.

3. The next general branch of the controversy relates to the stock in trade, and involves the inquiry whether either party has any claim on account of any individual or separate property put into the partnership concern.[4] The allowances claimed by the complainant, and which have been rejected

by the commissioners, embrace: 1. The value of the Beckwith House. 2. The legacy under the will of Harvey Hyde. 3. The legacy under the will of Sarah Goodwin.

1. It is contended on the part of the complainant that all these items were separate and individual property, which has been applied to the use of the partnership, and for which the complainant is entitled to credit in the settlement of the partnership accounts. With respect to the first, it is contended that the property was owned by Justin before the commencement of the partnership, and must of course have been his private property. The evidence as to the commencement of the partnership is extremely vague and uncertain. The bill alleges that this was properly owned by the complainant previous to the commencement of the partnership, and charges the value to be $2,000; admits, however, that the buildings were afterwards repaired and enlarged out of the funds of the partnership, and the property sold in 1815 for $4,000, and the money applied to the use of the firm. The answer alleges the cost of the lot to have been only $200, and that it was paid for out of the partnership funds.

---

[4] In stating an account between partners, the true dates as furnished by the books of account themselves, ought to be assumed. Stoughton v. Lynch, 1 Johns. Ch. 467. The period of the dissolution of a partnership is the proper time to make a rest, and adjust the balance of the partnership account, and the partner against

whom the balance is found is chargeable with interest thereon. Id. Joint owners or partners are not entitled to charge each other for services rendered in the care and management of the joint property, unless there is a special agreement for that purpose. Franklin v. Robinson, 1 Johns. Ch. 158; Bradford v. Kimberly, 3 Johns. Ch. 434. But, where the several partners, who are joint owners of a cargo, appoint one of the partners their agent or factor, to receive and sell it, receive the proceeds, &c., a compensation is necessarily implied in such special agreement. And as such factor, he has a lien on the goods or their proceeds not only for his advances, responsibilities, &c., but for the balance of his general account. Id. 431. The solvent partner, and the assignees of a bankrupt partner must all join in a suit at law. Murray v. Murray, 5 Johns. Ch. 70. In settling the accounts of a mercantile concern, in a controversy between the partners only, it is sufficient to examine and state the books of the copartnership, without requiring vouchers in support of each specification. Fletcher v. Pollard, 2 Hen. & M. 544; Brickhouse v. Hunter, 4 Hen. & M. 367. Where one joint owner assigns his interest in the freight and cargo of a particular vessel, on a particular voyage, the other partner who has got possession of the proceeds of such freight and cargo, is entitled to retain them until he is paid or indemnified for what he has paid or advanced more than his share, for outfits, repairs or expenses of the ship for that particular voyage or adventure, but not for any claims he may have against his copartner, arising from former distinct voyages and adventures, in which they were concerned together in the same or other vessels; they not being general partners in trade, nor any connection existing between the different transactions on voyages. Mumford v. Nicoll, 20 Johns. 611, 4 Johns. Ch. 522. The solvent partner is entitled as against a bankrupt partner, to no more than his share of the surplus, after the partnership debts are paid. Murray v. Murray, 5 Johns. Ch. 70. A partner who goes abroad on his own personal affairs, is not entitled to charge his expenses to the partnership. Mumford v. Murray, 6 Johns. Ch. 17, 452. Equity has not an exclusive jurisdiction in matters of account, whether partner-

The only claim which the complainant could upon any plausible ground sustain. would be for the original cost of the lot; for he admits the improvements were paid for out of the partnership funds; and in addition to this, the evidence shows that their father assisted in making such improvements, for the joint benefit of both his sons. And when the property was sold in 1815, the money was applied to the use of the firm without any charge or claim by Justin that it was private property. This affords a strong presumption. that it was not at all times so considered by him, and may fairly be viewed, under the circumstances, as a waiver of any such claim.

2. The legacy under the will of Harvey Hyde, amounting to upwards of $4,000, was received· in the year 1806, and applied to the use of the firm. It has been attempted on the part of the defendants to show that although this was in form a legacy to Justin, it was intended for the benefit of him and Elias jointly. Such evidence was altogether inadmissible. The will is plain and explicit. and could not be explained or contradicted by any parol evidence. But although

this must be considered originally as the private property of Justin, we think, under the circumstances, he must be considered as having voluntarily applied· it to the use of the firm in such manner as to relinquish all claim upon it as private property. It was not thus applied with the knowledge or consent of Elias, nor any charge whatever made of it against the firm, or any claim to it as private property ever set up until recently. And if it should be admitted that in ordinary partnerships one partner might have a claim upon the firm for private funds, put into the concern without the knowledge of the copartners, (which, however, is by no means intended to be admitted,) ·yet we think the claim cannot be sustained in the present case. The general course of business between the parties, their acts and declarations, show very satisfactorily that everything was intended to be held in common between them; and after such a lapse of time, and under such circumstances, all individual interest in this legacy must be considered as abandoned.

3. These considerations and this view of the case will apply, also, to the legacy in the will of Sarah Goodwin, as well that which consisted of the furniture, which was disallowed by the commissioners, as the money legacy, which was allowed to Justin. It is not perceived that any well-founded and substantial difference exists between them; and the only circumstances in which this legacy differs from that of Harvey Hyde, are that the one was a bequest to Justin himself, and the other to his wife; and an entry with respect to the latter was made in Justin's books, in New York. But this was made by his clerk, and without his knowledge or direction, and without the knowledge or consent of ᴛᴧias. The circumstance that the bequest was to his wife, cannot vary the case. When received, it became the property of the husband. The report of the commissioners must, therefore, with respect to this legacy ($331 11), be corrected, and this sum considered as common property.

4. The next subject of inquiry, which appears naturally to arise in order, relates to the claims which have been set up by Elias, for an allowance against Justin, for the losses which have been sustained upon several contracts and branchés of business entered into ·and undertaken by him. These relate:[5] 1. To the Worcester and Stafford Turnpike stock. 2. The land purchased by Justin, in Green county, in the state of New York. 3. The loss sustained upon the purchase of the ship Resource. 4. The loss upon the purchase of the ship Carrier. The

---

ship or otherwise. Duncan v. Lyon, 3 Johns.· Ch. 360. An action of account may be brought at law by one partner against another. So an action of covenant, where there is a covenant to account. So also an assumpsit will lie on a promise in writing by one partner to take part of goods bought, in which they were to be equally concerned as to profit and loss. Id. It is not a correct principle, that one partner is chargeable with all the earnings of the concern, without evidence that he had received them, while he is credited only with such sums as he proves he has paid away; especially where the other copartners had equal access to the books, and equal management of the affairs. The partners are chargeable only with what they have respectively received. Richardson's Ex'rs v. Wyatt's Ex'x, 2 Desaus. Eq. 471. The bad debts must be borne equally by the whole concern, during the lives of the partners; and the executors of a deceased partner forbidding payment to the executor of the last surviving partner, the bad debts shall fall on the concern. Id. The partner who kept the house was allowed board out of the partnership funds, for the journeymen and apprentices, as reported by the master. Id. A partner having withdrawn from a mercantile company, and being afterward erroneously included in a suit against a new company formed by the other partners, may be relieved in equity against a judgment therein obtained, upon the ground that one of the company prevented his making defence at law, by assuring him the matter should be adjusted. Lee v. Baird, 4 Hen. & M. 453. Upon a dissolution of a copartnership a settling of its accounts becomes indispensable, and must include all debts due to the company. whether from its members or others, and all debts due from the company. either to the partners or to strangers. But upon a partial division of capital, such a settlement is not indispensable, whether upon an agreement for such a division, any one of the partners can be required to take his own debt in payment of his part of the capital depends upon the fact whether the debt be then demandable. If it be, this may be insisted upon. but if it be not, the agreed division of capital does not per se change the character of the debt. Attorney General v. State Bank, 1 Dev. & B. Eq. 553.

---

[5] In the state of New York, although a court of equity considers and treats real property as a part of the stock of the firm, it leaves the legal title undisturbed, except so far as is necessary to protect the equitable rights of the several members of the firm therein. Buchan v. Sumner, 2 Barb. Ch. 165. Where real estate

losses sustained upon these several transactions appear. from the evidence, to be very great; but there is nothing from which we can draw the conclusion of any fraudulent conduct on the part of Justin. There might have been a want of judgment and discretion, but all was done in good faith; and if the parties were partners in these transactions, as has already been decided, it follows. as matter of course, that the loss must be sustained by the firm, and cannot be thrown upon the individual partner, through whom it has been sustained. It is, therefore, unnecessary to enter into an examination of the voluminous testimony which has been taken upon these several subjects.

5. Another subject of inquiry, which has given rise to much discussion, and upon which the commissioners have made different reports, relates to what has been called the Simeon Lyman note. dated 10th November, 1815, for $4,649 95. In the first report, this was considered a partnership note, and binding on the firm, and that it had been paid by Justin out of his own private property, or in such a manner as to discharge the firm from any liability upon it. This has, however, been corrected in the second report, on the ground that this note, or the one given by Thomas Lyman as a substitute for it, had been paid by Justin out of property put into his hands by Henry Lyman, and not out of his own private funds. It is not perceived how this circumstance, which alone seems to have changed the report of the commissioners, can have any influence upon the question as between Justin and Elias Lyman. It is not pretended but that this note was originally given towards payment for the Green county lands; and, indeed, it was upon this ground that it was urged, on the part of Elias, that he was not bound to contribute towards the payment; contending that this purchase was a private transaction of Justin's. If such was the view taken by the court of this purchase, it would certainly follow that Elias could have no concern with the payment of this note. But this purchase has not been so considered, but that it was a partnership transaction; and the note being given towards payment for it, it was a partnership debt. And where one partner discharges a partnership debt out of his own individual funds, equity will always enforce a contribution. Whether this note has been paid out of funds which Justin held of Henry Lyman, or not, is immaterial. We cannot enter into any inquiry of the transactions between Justin Lyman and Henry Lyman. He is no party to this suit; and a decree in

is conveyed to copartners. in their individual names, for the use and benefit of the firm, or is so conveyed to them in payment of debts due to the partnership, the legal title vests in the grantees thereof, as in an ordinary conveyance of real estate. And by the common law, where land was purchased with copartnership funds, for copartnership purposes, and was conveyed to all the partners generally in fee, it would at law, create a joint tenancy: so that neither could convey more than his share of the land during the lives of his copartners. And upon the death of either of the copartners without having severed the joint tenancy by a conveyance, the legal title to the whole of the land would survive to the other copartners. Id. But under the statutes of New York, relative to joint tenancies, the several copartners to whom such a conveyance was made. would become tenants in common of the legal title. And upon the death of either, the undivided portion of the legal title thus vested in the deceased partner, would descend to his heirs-at-law, without reference to the equitable rights of the several partners in the land, as a part of the property of the firm. Id. A partner has no remedy against his copartner for money paid or advanced on account of the partnership. or for profits made during its continuance. until a final settlement of the partnership. Camblat v. Tupery, 2 La. Ann. 10. Vide Story. Partn. 221, 348, and notes. Where a debt is due to a copartnership at the time of the bankruptcy of one of the individual members of the firm, the legal title to the share of the debt belonging to the bankrupt partner, is vested in his assignee by operation of law: and an action at law to recover the debt. must be brought in the joint names of the other copartners and of the assignee in bankruptcy. Coe v. Whitbeck. 11 Paige. 42. But the solvent partners have the right to bring such suit in the joint names of themselves and of such assignee, without the consent of the assignee. upon giving him indemnity against costs. Id. For a forcible expulsion from a partnership establishment. in the profits of which the expelled partner was to have an interest after the cost was reimbursed, the expelled partner is entitled to damages equal only to the probable injury which is the prospect of profit. Jones v. Morehead. 3 B. Mon. 377. A partner may assign his interest to another. who. after the expiration or dissolution of the partnership. may maintain a bill for his share of the profits. Mathewson v. Clarke, 6 How. [47 U. S.] 122. Where a partner fraudulently. without the consent of his copartners, applies the partnership funds to his private purposes and profit. or invests the same in his own name, or for his own use, his copartners may, if they can distinctly trace the investment, follow it, and treat it as trust-property held for the benefit of the firm, by the partner, or by any person in whose hands it may be. except a bona fide purchaser, without notice. Kelley v. Greenleaf [Case No. 7,657]. Where one partner, without the knowledge and consent of the other, appropriated partnership funds to the purchase of real estate, upon which there was a mortgage, a decree was rendered in favor of the plaintiff, and the real estate ordered to be sold by a master, and the proceeds to be applied, first, to the discharge of the mortgage, and the residue to the discharge of the debt due to the partnership. Id. If the defrauding partner dies, his representatives stand in no better situation than the partner himself would if living. Id. So private creditors of the deceased partner are not entitled to make claim thereto. Id. The functions, rights and duties of partners, in a great measure comprehend those both of trustees and agents. Id. Where a debt is due to a copartnership at the time of the bankruptcy of one of the individual members of the firm. an action at law to recover the debt must be brought in the joint names of the solvent copartners. and of the assignee of the bankrupt: the legal title to the debt being vested in them jointly by operation of law. Coe v. Whitbeck, 11 Paige, 42. But the solvent partners have the right to bring the action in the names of themselves and the assignees of the bankrupt, without the consent of such assignees. upon giving them an indemnity against costs. Id.

this cause would not be binding upon Henry Lyman or his assignees. Their controversies with Justin cannot be drawn in question here; they are transactions inter alios. If this was a partnership note, and has been paid by Justin, not out of partnership funds, he is entitled to contribution from Elias. The report in this respect must, therefore, be so far corrected as to make this note, and the costs and expenses which ʰave been incurred about it, a partnership concern; deducting therefrom $1,500 paid by Thomas Lyman. It seems to be admitted that Justin has paid $5,595 67; but whatever has been paid must be borne by the partnership.

6. Another exception to the report taken on the part of the complainant, is the rejection of the account contained in the schedule marked O, said to have been taken from what he calls a log-book.[6] This account was rejected because he refused to produce the book in which it was contained. The rejection of this account upon the first hearing was certainly proper. The original book should have been produced, and the account, unsupported by proof, could not be admitted. It was immaterial whether it was a regular book of accounts or not; whether called a log or a diary, or whatever name was given to it, was of no importance. It was a book containing the original entries of the items of which the account was made up, and the refusal of the complainant to produce it afforded a presumption that the same book would furnish evidence beneficial to the opposite party. On the second hearing, this account was again offered, supported by the oath of the party, but rejected because he still refused to produce the book. We think the account was properly rejected the second time. It was the right of the opposite party to have it produced, for under the circumstances there was reason to suppose the book would show credits or contain some entries favorable to the defendants; and the only mode in the power of the commissioners to protect the rights of the opposite party was by rejecting the account, unless the book was produced. It appears, however, from the report of the commissioners, that receipts and vouchers in support of some part of this account were offered in evidence, but rejected. These, we think, should have been admitted, and the account allowed so far as established by such vouchers. To what portion of the account they applied, was not shown on the argument, nor have we been able satisfactorily to ascertain the amount from the mass of papers submitted to us. The amount, however, which shall be found thus supported must be allowed. This can probably be easily ascertained by the parties, and if not, it must be referred to the proper officer to examine and report thereon.

7. Another general branch of the controversy relates to family expenses of the respective parties during the continuance of the partnership. The commissioners refused to enter into an examination of such expenses, on the ground that neither party had kept any account in relation thereto, and that both understood that none was to be made or charged on either side. This view of the case, we think, is fully supported by the evidence and the admission of the parties, and is a strong circumstance in corroboration of the general and unlimited connection between the parties in business, and that all

---

[6] The log-book of certain vessels is, in the United States, made evidence by act of congress of the fact of desertion by a seaman. See Ing. Abr. 612, § 2. It is, however, never conclusive, but only prima facie evidence, and may be rebutted. Jones v. The Phoenix [Case No. 7,489]; Malone v. Bell [Id. 8,994]; Thompson v. The Philadelphia [Id. 13,973]; Douglass v. Eyre [Id. 4,032]; Orne v. Townsend [Id. 10,583]. The log-book, in general, ought not to be admitted to establish any facts save such as are contemplated by the act of congress. Jones v. The Phoenix, supra. It is in no sense per se evidence, except in certain cases provided for by statute. It does not import legal verity; and in every other case is mere hearsay not under oath. It may be used against persons, however, to whom it should be brought home as having a concern in writing or directing what should be contained therein, to contradict their statements or their defence. But it cannot be received as evidence for such persons, or others, except by force of a statute rendering it so. Per Story. J.. in U. S. v. Gibert [Case No. 15,204]. On an indictment of several seamen for a revolt and confining the master, they defended on the ground (among others) that the master was insane. To rebut this, the prosecutor offered the log-book, kept by the master during the period of his alleged derangement, in which, as he said, he made entries every night: held, that it was inadmissible. U. S. v. Sharp [Id. 16,264]. An entry in the log-book is indispensable evidence of the fact of desertion, when a forfeiture of wages is insisted on; it is necessary, in order to show that no consent was given, and no release was intended by receiving the delinquent again on board, as well as to ascertain the fact of desertion generally with greater accuracy. Malone v. Bell [supra]; Phoebe v. Dignum [Case No. 11,110]; Douglass v. Eyre [supra]. Whether the entry in the log-book, in order to be evidence, must have been made (according to the letter of the act of congress) on the very day on which the alleged desertion took place, does not appear to be as yet authoritatively settled. In Phoebe v. Dignum, supra, the court seem strongly to favor the notion that it must. But Hopkinson, J., in Douglass v. Eyre, supra, contends that it need not under all circumstances; for in some cases it would be impossible. At any rate, the entry purporting to have been made on the day, is prima facie evidence that it was so made, and it lies on the opposite party to show the contrary. Where the log-book is offered, it must be identified: and where the party offering it called a sailor belonging to the vessel, who deposed to the handwriting of the mate in several parts of it, and that during the voyage he saw him marking the words "log-book," &c., on the cover; held notwithstanding this testimony, that as the book may not have been kept on the voyage, but might afterwards have been made up by the mate to suit the purposes of the cause, it was not sufficiently identified. And this, though the opposite party had given notice to produce the log-book. U. S. v. Mitchell [Case No. 15,791]. See, further, as to a log-book as evidence, Bixby v. Franklin Ins. Co., 8 Pick. 89; Smallwood v. Mitchell, 2 Hayw. [N. C.] 145, 146.

their property was held in common. This rule must be understood, however, as applying only to expenses incurred for the children whilst they were under age and remained members of the family, and the parents had the right to command and avail themselves of the benefit of their services. The evidence and admission of the parties cannot fairly be considered as extending beyond this; and whatever advances were made to the children of either party after they were of age, and by way of portion to them, must be accounted for. To this extent, it was a withdrawal and separation of a part of the partnership property from the concern, and applying it to purposes altogether distinct and unconnected with their business or the expenses incident to it. These advances are but trifling, as claimed to have been made by Elias to two of his children, viz., about $517 to his son Wyllis, and $600 to his daughter on her marriage. These advances, whatever they were, must be charged against Elias. If, however, all the advances to Wyllis were made for his education, and whilst he remained a member of his father's family, although after he was of age, it is not intended should be charged against Elias.

8. Another subject of complaint on the part of Justin is, the allowance made by the commissioners for the services of Lewis Lyman and Norman Lyman, as clerks for the firm. The allowance which has been made appears to the court to be pretty high, but it is a subject upon which we think we ought not to interfere. The commissioners were under better advantages to judge upon that subject that we can be; but that the firm was properly chargeable with expenses of clerk-hire cannot be questioned, and it was immaterial whether such clerks were the sons of one of the parties or mere strangers. No allowance has been made for them whilst they were under age, and the parent entitled to their service. After that period, they were entitled to their own earnings, and would have had a right to leave the service of their father. So far, therefore, as an allowance has been made for their services after they were of age, and whilst in the employment of the partnership, or in and about the business of the concern, we think is properly chargeable against the firm. Payment has actually been made by Elias to Norman, and he is entitled to contribution from Justin, although Norman may not have fully accounted for the property in his hands.

9. The exception, on the part of Elias, to the allowance made Justin of his account marked P, amounting to $1,651 64, must be overruled. It is admitted that these were expenses incurred about the Green county lands, and must follow the decision respecting that patent. These lands having been considered partnership property, the expenditures embraced in the account now in question must be borne by the concern.

10. The exceptions taken by Lewis Lyman

to the report will depend upon the light in which the arrangement between him and his father Elias, preparatory to the dissolution of the partnership, is to be considered. If it was an absolute sale of the property, there can be no grounds upon which Lewis can claim commissions for his services in the collection of the debts due to, and the payment of those due from the firm; and in such case there can be no surplus for which he can be made accountable. But if he acted as an agent for the concern, and has faithfully discharged his duty as such, he is entitled to compensation either by way of commissions or otherwise. The complainant has not, by his bill, treated this as an agency concern, but as a fraudulent transaction, charging it to have been a pretended sale, without any consideration whatever of all the goods, wares and merchandise contained in their stores in Hartford (Vermont) and Montpelier, and all the notes, book-accounts, and stock, and yarn at the cotton factory, &c. And Lewis Lyman, in his answer, also treats it as a purchase. He states that his father offered to sell to him all the goods then on hand, and all the demands due Justin and Elias, at what was called that end of the concern, meaning the goods in Hartford and Montpelier, in Vermont; and the demands there accruing upon his paying all the debts due from the firm at that end of the concern, and a certain part of the debts contracted at Hartford, in Connecticut, the light goods to be invoiced at their cost in Boston, and all heavy goods at their cost and transportation, and all other goods—that is to say, goods purchased at earlier periods in the same proportion, having reference to their actual costs: to which proposition he agreed. That an invoice was taken of the goods upon the above principles, and the goods removed, and that he gave his father a bond to pay the debts he had undertaken to pay, for the goods and debts so delivered to him, he taking the debts at his own risk. And from the bond given by Lewis, it appears clearly to have been a sale of the goods, and not an agency concern. The answer of Elias to this part of the bill is not very intelligible. He states that Lewis Lyman agreed to purchase all the stock in trade in the stores at White River and Montpelier, and the notes and accounts, &c., and setting out the terms of the contract substantially the same as stated by Lewis, and avers that the goods were inventoried and sold, as he verily believes, at their true and just value. But he does allege, that Lewis was to account to him and Justin for whatever balance there might be in his hands arising from the sale of the said goods at the price agreed on, and arising from such of the securities and accounts, transferred as aforesaid, as could be collected.

Whatever construction is to be put upon this answer of Elias, it can in no manner prejudice the rights of Lewis. It is not evi-

dence against him, nor is there any testimony to support this view of the transaction; and Lewis does not, in his answer, admit himself accountable for any surplus. He does not, to be sure, set out a statement of the account, and the result growing out of the transaction; but this was not called for by any charge in the bill, or any special interrogatory put. The bill charged the transaction to have been a fraudulent sale, without consideration; and this statement might have been made for the purpose of showing the consideration, and to meet the charge of fraud alleged in the bill, and for that purpose it was very proper. The only inquiry, therefore, that can arise with respect to this transaction, is, whether it was a fraudulent sale or not. The principal ground of complaint relates to the discount upon the cotton yarn. The discount allowed by Elias was sixty-five per cent.; and it is claimed that only forty per cent. should have been allowed. The evidence in relation to this cotton is somewhat contradictory, and the discount allowed would seem to have been greater than the weight of evidence would fairly warrant. But we cannot undertake to say that it furnishes evidence which will warrant us to pronounce the sale fraudulent; nor do we think there is any evidence in the case that would justify setting aside the sale as fraudulent. The claim for commissions was properly rejected, and the account between Lewis and the firm restated, putting the transaction upon the footing of an absolute sale, and of course discharging Lewis from responsibility for any surplus.

11. There can be no doubt but that the firm is chargeable with the eight notes dated the 6th of November, 1819, drawn by Norman Lyman, and endorsed by Elias, in the name of the firm. They were applied to the use of the firm, and it is of no consequence that Justin had refused to endorse them. The partnership still existed, and Elias had the legal right to bind his copartner in matters coming within the scope of the partnership. These are all the items which have been drawn in question by the respective parties under their exceptions to the reports of the commissioners, so far as they relate to personal property, and the conduct of the parties in the management of the business during the continuance of the partnership. But a still more embarrassing inquiry remains, as to the mode and manner in which the concerns of the partnership are to be settled and distribution of the funds made.[7] This does

not, however, arise so much from the want of adequate powers in the court, as from the fears entertained that injustice may be done to the parties by reason of the loose manner in which their business has been con-

---

[7] Where a partnership is admitted an account can be had, notwithstanding the defendant denies there is anything due to the complainant, and even though the answer alleges that the latter is indebted to the former. And where, on the taking of the accounts, an indebtedness appears (i. e. by the complainant to the defendant), the defendant can have a decree for the balance. Scott v. Pinkerton, 3 Edw. Ch. 70. Where A. is a partner in two distinct firms, neither firm can sue the other for an amount alleged to be due. Rogers v. Rogers, 5 Ired. Eq. 31. If A. be insolvent, the proper course is for the firm claiming to be the creditor firm, to charge him on its books for the amount believed to be due. Id. If A. be insolvent, then the accounts of the creditor firm should be adjusted, and a bill may be brought by the remaining members of that firm against the debtor firm to recover the amount due from the latter after deducting what may be due to A., if anything, upon the adjustment of the accounts of the creditor firm. Id. When in a copartnership there is no specific agreement as to the division of losses and profits, they are to be divided equally. Jones v. Jones, 1 Ired. Eq. 332. To effect a complete settlement of partnership concerns, the interference of a court of equity may be necessary; and when necessary for that purpose, it will entertain jurisdiction, whether an action of account would or would not lie between the parties. Gillett v. Hall, 13 Conn. 426. Therefore, where the parties to the articles of partnership were A. on one part, and B. and three other persons on the other part, and A. brought his bill in chancery for an account against B. and others, alleging that some of the defendants forcibly and fraudulently seized upon notes, accounts and other papers belonging to the partnership, and took them from the plaintiff's possession, and still withheld them; it was held that this was a proper subject of equitable jurisdiction. Id. Where the original bill sought the adjustment of a partnership account, and a supplemental bill was filed, calling for the production of papers in the defendant's hands, to be lodged with the clerk of the court for inspection, and praying for an injunction against them with respect to the partnership debts and effects; it was held, that the matters alleged in the supplemental bill might properly be considered in connection with the original bill, in deciding upon the question of jurisdiction; and in this view, the jurisdiction was unquestionably sustainable. Id. In Connecticut, no action at law will lie between partners for the settlement of a partnership account, where their number exceeds two. Id. 433. A., B. and C. borrowed money jointly, but appropriated individually unequal sums. The benefit to each is according to the amount appropriated by each; and in the event of the insolvency of either, the loss should be sustained by the solvent partners in the proportion of the sum employed by each for his own use. Kincaid v. Hocker, 7 J. J. Marsh. 333. To settle and adjust a copartnership, and to recover the balance due the active from the dormant partner, who has been in the receipt of none of the property or avails of the copartnership, but owes a balance to the active partner, from its being a losing concern, a bill in chancery is the only remedy. Spear v. Newell, 13 Vt. 288. Where A. and B., partners, sold a stock of goods to C. and D., partners, taking their notes for the amount; and D. afterwards withdrew from the latter firm, and A. became partner with C., by purchase, paying for the interest by a receipt against the notes originally given by C. and D.; B. had no interest in this new partnership, and was not entitled to be made a party to a bill by A. for a settlement and account. Howell v. Harvey, 5 Ark. 270. Where A., B. and C. are in partnership, and C. sells all his interest in the property and credits to D., who takes his place in the firm, and a bill for settlement and account is subsequently filed by B. against A. and D., C. need not be made a party. Id.

ducted and the undefined and unlimited nature of their partnership connection. It seems that in the course of their business, the partnership extended, among other things, to the purchase and sale of real estate; the conveyances generally, having been taken to the individual partner who made the purchases, although admitted on all hands to have been intended for the benefit of the firm. There can be no doubt that under the circumstances of the case, these lands are to be considered as stock in trade, and, upon the dissolution of the partnership, to be equally divided between the partners; and how this is to be done is the question. On the part of the defendant Elias, it is contended that the real estate should be specifically divided, leaving each party in possession of what he held in his own name at the dissolution, according to its then valuation, he being accountable to the other for the balance and the interest thereon, as the same shall be found on such valuation. On the part of the complainant, it is contended that the property should be sold under the order of the court, leaving each party to bid for the same at his election, and the value to be thus ascertained and the proceeds divided between them. ‧Some objections have been made to this latter mode of winding up the concerns of the partnership, arising out of the state of the pleadings and the powers of this court. These must be disposed of in the first place.

It is said that the complainant's bill is not so shaped as to authorize an order for the sale of the property; that such order cannot be granted without a specific prayer to that effect.[8] This, we apprehend, is a mistaken

view of the bill. The specific relief prayed is, that the defendants may render an account of all property, real and personal, in the possession of either of them, or of any other person, belonging to the said Justin and Elias, or the proceeds thereof; and that an account may be taken of all and every the partnership dealings, transactions and property, from the time of the commence-

---

view of the case, it may afford assistance in the other. Strange v. Watson. 11 Ala. 324. Vide Story. Eq. Pl. 40–43; 5 Port. [Ala.] 26. A bill may be framed with a double aspect, where it is doubtful what relief the complainant is entitled to, on the facts of his case. Colton v. Ross, 2 Paige, 396; Foster v. Cook, 1 Hawks. 509; Lloyd v. Brewster, 4 Paige, 537; Lingan v. Henderson. 1 Bland, 252. In such case the relief prayed for may be in the alternative; but it must be consistent with the case made by the bill. Id. Where the case made by the bill entitles the complainant to one of two kinds of relief. but not to both, the prayer should be in the disjunctive. Id. So, if it be doubtful whether the facts of the case entitle him to the specific relief prayed for, or to relief in some other form. his prayer concluding for relief should be in the disjunctive. Id. In such case, although the complainant should not be entitled to the relief specifically prayed for, he may, under the general prayer, obtain any other specific relief consistent with the case made by the bill. Id. But where the complainant prays for particular relief, and for other relief in addition thereto, he can have no relief inconsistent with such particular relief, although it should be founded upon the bill. Id.; Foster v. Cook, 1 Hawks, 509; Chalmers v. Chambers. 6 Har. & J. 29. Where there is a prayer for particular relief, and for general relief, if the particular relief cannot be decreed, the complainant may resort to the general prayer, and pray ore tenus. any relief warranted by the bill and the facts. Allen v. Coffman, 1 Bibb, 469. But where there is no obstruction to the particular relief, he cannot abandon it, and ask a different decree under the general prayer. Id. Under the prayer for general relief, the plaintiff in equity cannot recover a claim distinct from that demanded, or put in issue, by his bill. Sheppard's Ex'r v. Starke, 3 Munf. 29; 1 Munf. 554, note; Robson v. McArthur s Heirs, 6 Pet. [31 U. S.] 82; Butler v. Durham. 2 Kelly [2 Ga.] 414; Chalmers v. Chambers, 6 Har. & J. 29. Where a bill was filed to have a mortgage deed recorded, which had been omitted to be recorded within the six months. and the bill closes with a general prayer for other and further relief. &c., a decree that the mortgaged premises be sold, &c., is not within the relief prayed by the bill. Id. A bill for one purpose cannot be made to answer another. Id. Where a bill charges that an act of the legislature is contrary to the constitution of the United States, and in violation of the rights of the complainant, and illegal and void, the court will not, under the general prayer for relief, declare such act unconstitutional or void. Smith v. Trenton Delaware Falls Co., 3 Green, Ch. [4 N. J. Eq.] 505. In bills in equity seeking relief, if any part of the relief sought be of an equitable nature, the court will retain the bill for complete relief. Traip v. Gould, 15 Me. 82. If the bill pray that a contract for slaves sold in violation of the constitution be annulled, it should offer to restore the slaves. Martin v. Broadus, Freem. Ch. [Miss.] 35. Where a party who has bought land and been let into possession, seeks to enjoin collection of the purchase-money, on the ground of fraud or a failure of title, he must pray a rescision of the contract, he cannot withhold the purchase-money and likewise keep the land. Williamson v. Raney. Id. 112. If the prayer of a bill be for an injunction alone, no other relief can be granted. Id. To a bill, praying a decree for the

---

[8] A party cannot travel out of the matter alleged in his bill, to make a ground of relief. Bank of U. S. v. Schultz, 3 Ham. [Ohio] 62. No relief can be given except a proper case be made by the bill. Knox v. Smith, 4 How. [45 U. S.] 298. It is not sufficient that it appear by the defendant's own showing, or from the proof that he has acted unjustly and inequitably. Id. If the object be to set aside a deed as fraudulent, the fraud, with the facts connected with it, should be alleged. Id. The prayer of a bill must be consistent with the case stated in the bill. McCosker v. Brady, 1 Barb. Ch. 329. Where a bill of partition alleged that a will under which the defendants claimed title to a part of the premises was invalid, and prayed that it might be annulled and cancelled and declared void, or in case the same should be declared to be valid, then that the plaintiff might have a partition of the premises; it was held that the prayer for a partition was inconsistent with the case made by the bill. Id. If a party is ignorant as to a particular fact, and wishes to obtain the proper relief as that fact should ultimately appear to be, he should frame the statements in his bill as well as the prayer for relief, so as to present the case in a double aspect. Id. It is not, in general, necessary to charge in the bill confessions and statements made by the defendant. Jenkins v. Eldredge [Case No. 7.266]. An interrogatory must be relevant to the matters charged; otherwise the defendant need not answer it. Story, J., Brooks v. Byam [Id. 1.947]. Where the complainant doubts his title to the relief he wishes to pray, the bill should be framed with a double aspect, so, if the court should decide against him in one

ment thereof, and that it may be decreed that the complainant take from the joint fund the amount of the money put into the concern of his private property, with the interest thereof; and that the residue thereof may be equally divided between the parties. In addition to this, there is a general prayer for relief. The specific prayer only asks for an account and division of the funds belonging to the partnership, but does not designate any mode in which the amount of the fund is to be ascertained. And the general prayer will authorize the court to adopt any mode consistent with equity and good conscience, and according to the course of chancery proceedings, and which shall not be inconsistent with the case made by the bill and the specific relief prayed. An order for

payment of a lost bond, an affidavit of the loss must be annexed. Pennington v. The Governor, 1 Blackf. 78; Taliaferro v. Foote, 3 Leigh. 58; Peart's Heirs v. Taylor, 2 Bibb, 556. Contra, Cabell's Ex'rs v. Megginson's Adm'rs, 6 Munf. 202. On a bill to rescind a contract, the court cannot decree a specific execution. Thus, on a contract for the sale of lands the vendee failing to show sufficient grounds for rescinding the agreement cannot have a decree for specific execution. Rochester v. Anderson. Litt. Sel. Cas. 146. Where a party resorts to a court of equity on account of a lost paper, upon a subject cognizable at law, but for the loss, an affidavit of the loss of the paper must be annexed to the bill; but where the subject-matter of the writing is properly cognizable in equity, an affidavit of the loss is not necessary. Peart's Heirs v. Taylor, 2 Bibb, 556. If an answer on oath has not been waived as to one of the defendants, the complainant, upon an application to dissolve the injunction, cannot be permitted to read the affidavits, annexed to the bill for the purpose of contradicting the positive answer of that defendant on oath. Haight's Case, 4 Paige, 525.

A bill with a double aspect, may be filed where the complainant is in doubt whether he is legally entitled to one kind of relief or another, upon the facts of the case as stated in the bill, in which case his prayer should be framed in the alternative, so that if the court decides against him as to one kind of relief prayed for, he may still obtain the proper relief under the other branch of his alternative prayer. Lloyd v. Brewster, 4 Paige, 537. So, also, where the complainant is entitled to relief of some kind against the defendants, upon the facts stated in his bill, if the nature or kind of relief to which he is entitled depends upon the existence of a fact of which he is ignorant, he may allege his ignorance of such fact, and may frame his prayer for relief in the alternative, so as to obtain the appropriate relief according as the fact shall appear at the hearing of the cause. Id. By the practice in Connecticut, it is not necessary to annex to a bill of interpleader, an affidavit of the absence of collusion. Nash v. Smith, 6 Conn. 421. Where a plaintiff resorts to a court of equity for relief, on the ground that a deed on which his claim depends has been lost or destroyed, the claim being such that if he had the deed he would have complete remedy by action upon it at law, the bill must distinctly aver the loss or destruction of the deed, and it must be shown that it could not be found upon due search, otherwise the court of equity has no jurisdiction of the case. Taliaferro v. Foote, 3 Leigh. 58. Where the complainant makes an officer of a corporation a party defendant for the purpose of obtaining a discovery as against the corporation, no relief, either general or special, should be prayed against such officer; and the prayer of the bill should be so framed as to show distinctly, that the relief sought is intended to be confined to the corporation; and that no relief whatever is to be asked as to the officer of the corporation at the hearing, even as to costs. McIntyre v. Trustees of Union College, 6 Paige, 239. If the bill contains no prayer, either for specific or general relief, it is considered as a bill of discovery merely, although the word "decree" is erroneously inserted in the prayer for process of subpoena; but if the bill prays any relief whatever against a defendant, who is made a party for the purpose of discovery only, such prayer makes it a bill for relief as well as discovery as to such defendant, and authorizes him to put in an answer containing a full defence. Id. A bill in chancery, seeking to transfer the jurisdiction of a case proper for a court of law, on the ground that the material facts were known to the defendant only, ought to be accompanied with an affidavit. Munday v. Shatzell, Litt. Sel. Cas. 373. If a bill, besides the usual prayer for general relief, contains a prayer for specific relief, the plaintiff is entitled to other specific relief, so far as it is consistent with the case stated in the bill. Wilkin v. Wilkin, 1 Johns. Ch. 111; Allen v. Coffman. 1 Bibb. 469; Cook v. Mancius 5 Johns. Ch. 89. The relief to be given under a general prayer in a bill, must be agreeable to the case made by the bill, and not different from, or inconsistent with it. Chalmers v. Chambers. 6 Har. & J. 29; Wilkin v. Wilkin, 1 Johns. Ch. 117; Franklin v. Osgood. 14 Johns. 527: English v. Foxall. 2 Pet. [27 U. S.] 595. Where a bill was filed to have a mortgage deed recorded, which had been omitted to be recorded within six months. and closes with a general prayer for other and further relief, &c., a decree that the mortgaged premises be sold. &c., is not within the relief prayed by the bill. Id. Under the general prayer, the complainant is entitled to any relief consistent with the case made, though inconsistent with the specific relief prayed for. Bailey v. Burton, 8 Wend. 339. In a bill in equity between partners, a prayer that the defendant may be held to render an account of all moneys and effects of the firm received by him, and of all other matters relating to the concern, is equivalent to a prayer for general relief. Miller v. Lord, 11 Pick. 11. Where a bill is for discovery and relief, in a case where discovery is the only ground of equity jurisdiction, it must be sworn to; but if the bill is for discovery merely, no affidavit is necessary. McElwee v. Sutton, 1 Hill, Eq. 33. A general prayer in the bill for relief, will authorize a decree for the specific relief appropriate to the case. Brown v. McDonald, Id. 302. A bill seeking to transfer to this court a matter properly cognizable at law, must be verified by oath. Lynch v. Willard, 6 Johns. Ch. 346. Though the bill should contain neither a special nor general prayer for relief, yet if the defendants answer the allegations, and submit themselves to the decree of the court on the merits, the defect as to the prayer will be disregarded by an appellate court. Smith v. Smith, 4 Rand. [Va.] 95. Praying that the heirs may be made defendants, without taking out process against them, or naming them in the bill, is not making them defendants. Huston v. McClarty's Heirs, 3 Litt. 274. Upon a motion to dissolve an injunction, if the complainant relies upon affidavits annexed to the bill under the 37th rule of the court of chancery, to contradict the answer, the defendant has a right to read affidavits or other evidence in support of his answer. Brown v. Haff, 5 Paige, 235. Under the general prayer, any relief warranted by the case as set forth in the bill. may be granted. though not orally asked for. Lingan v. Henderson. 1 Bland. 251. Where a prayer for specific relief in a bill in chancery is accompanied with a prayer for general relief, the complainant is entitled to other specific relief not inconsistent with the case stated in the bill; but no relief can be granted under the general prayer entirely distinct from, and independent of the special relief prayed. Thomason v. Smithson, 7 Port. [Ala.] 144.

the sale of the real estate would involve no such objections in this case.

Another objection which has been made to such an order, is, that as the lands lie in different states, the order could not be enforced, except as to the lands within this district or state. This objection cannot be well founded. Such an order does not require the agency of any officer out of the jurisdiction of this court. The order is to act upon the parties in the cause; and the transfer of the title is to come from them, and not from the person through whose agency the sale shall be made. It is not like the case of land sold under execution. If the court has not the power to order a sale, it has not jurisdiction over the subject-matter at all, and cannot divide the land or compel either party to release his title to that lying in another state, and suits must be commenced in each state where the land lies. Such inconvenience in the administration of justice cannot be tolerated, and the powers of this court, we think, are amply sufficient to direct a public sale of the land, and to compel the parties to convey the title accordingly. An order for the sale of the property may operate injuriously upon the interest of Elias, under the circumstances in which he is placed. But this will arise from his own negligence in permitting such a length of time to elapse without having the partnership concerns settled. If this had been done immediately upon the dissolution, and before he had made any improvements, no injury could have arisen from such a sale. The dissolution was his own act; and the continuance of such an undefined partnership was at his own option, he could have dissolved it at any time; and if parties will be so improvident, where they have it in their power fully to protect themselves, courts of justice cannot always redeem them from the penalties of their imprudence. It is well said, in one of the cases on this subject, if men will thus enter into partnership, as into a marriage, for better and worse, they must abide by the consequences. The cases in the books are certainly very strong to show that the complainant has a right to require a sale of the property. It is laid down by Gow, in his valuable treatise on Partnership (page 291), that when the common property of the partnership is ascertained, either party may insist upon a sale of the whole concern. That one partner has no claim upon his individual proportion of a specific article, but may require the whole concern to be wound up by a sale, and have a division of the produce of the aggregate joint effects. That one partner cannot separate his share from the bulk of the joint property, nor compel his copartner to accept what, according to a valuation, his interest may be worth. That is not the mode in which a court of equity winds up the concerns of a partnership; but in every case in which that court interferes in closing the transactions of a partnership, it directs the value of the stock to be ascertained in the

way in which it can be the best ascertained, viz., by a sale, and its conversion into money; and in these rules and principles it seems well supported by adjudged cases and the course of courts of chancery. In the case of Crawshay v. Collins, 15 Ves. 220, it is laid down, that upon the dissolution of a partnership, each partner becomes tenant in common in each and every article embarked in the concern, and has a right to have the value of the property ascertained by a sale. And in Fox v. Hanbury, Cowp. 445, it is said the right of the several partners is not to an individual proportion of a specific article, but to an account; the property to be made the most of and divided. And in Featherstonhaugh v. Fenwick, 17 Ves. 309, the same rule is fully recognized, that upon the dissolution of a partnership, when there are no articles prescribing the terms, the law ascertains what shall be the consequence of the dissolution, viz., that the whole of the joint property must be sold off and the whole concern wound up; and that one partner cannot insist upon taking the share of another at a valuation. The circumstances of that case were somewhat like the present. One question before the court was, whether one partner was bound to adjust the partnership concerns in the manner proposed by the other: which was, that a value should be set upon the partnership stock, and each one take his proportion according to such valuation, or should take away his share of the property from the premises. The master of the rolls was clearly of opinion that the other partner was not bound to accept the proposition, but had a right to have the whole concern wound up by a sale and a division of the produce. Other cases might be referred to in support of the same doctrine, if necessary; but the rule seems to be too well established to require any further confirmation.

An order must, therefore, be entered for a sale of all the real estate belonging to the partnership at the time of the dissolution, and the title to which is now either in Justin or Elias Lyman. The purpose for which the sale is to be made, is to ascertain the value of the property at the dissolution. It must be sold, however, as it now is, and at its present value; and to secure to each party the benefit of his improvements, the cause must be again referred to ascertain the value of the improvements made by the respective parties, and the report of the commissioners, with respect to the rents and profits since the dissolution, must stand over until the return upon such sale shall be made, and the coming in of the report relative to the improvements. This order will not, of course, extend to the Cairo patent lands, the title to which stands in the name of Simeon Lyman; nor is any notice intended to be taken of any part of the controversy in which he is interested. He is not a party to this suit, and no decree made in it can affect his rights. The report of the commissioners, with respect

to the deduction of twenty-five per cent. from the nominal retail price upon goods received by Justin, in payment for the lands sold to Henry Lyman, and, also, with respect to the evidence rejected by them on the second hearing, and the disallowance of the complainant's charge for the good will of the store at Hartford, is confirmed.

The statement of the accounts between the parties, must be corrected in the several particulars mentioned in this opinion, which may probably be done by the parties themselves; and if not, a reference must be made to a proper officer to restate the accounts with such corrections. And a final decree thereupon is reserved until the coming in of the return upon the sale of the real estate, and the report upon the value of the improvements made by the respective parties since the dissolution of the partnership.

Upon the coming in of the report, numerous exceptions were taken by the parties, and were argued and disposed of at the October term, 1830. The following is the only part of the opinion then delivered, involving questions of professional interest:

THOMPSON, Circuit Justice. It has also been urged upon the court to expunge from the accounts all allowances which have been made for improvements by either party upon the real estate after the dissolution of the partnership. This is one of those extraordinary and complicated cases of partnership that it is difficult, and indeed impracticable, to do complete justice between the parties, by applying to it the general rules applicable to ordinary partnerships. It may, perhaps, be admitted as a general rule, that after the dissolution of a partnership, one partner cannot call upon another for compensation for improvements made on the partnership property after the dissolution. This, as a general rule, is undoubtedly just and equitable. Such improvements are voluntary, and it might be deemed the folly of the party to make them, as it would be in his power immediately to cause a distribution to be made of the property, and each partner to take possession of his share. All just allowances will always be made for the costs and charges for taking care of the property until partition can be made, where no unnecessary delay takes place. It is not, however, without precedent for a court of chancery, when a dissolution has taken place without the consent of all the partners, and the partnership property continued to be employed, as before the dissolution, to hold the partner who thus employs the common stock accountable for all the profits. In the present case, the improvements which have been made by the respective parties may very fairly be considered as made by consent. There was at least no objection, and an implied acquiescence may be inferred from the circumstance, that it appears to have been the understanding of both parties that each one was to

retain possession of what he held at the dissolution, accounting to the other for the balance and interest, however it might be found on the winding up of the business. And if under such impression improvements were made, supposing them to be on the individual property of each, it would be inequitable for the other to throw the whole cost of the improvements upon him who made them; although it is fairly to be inferred that it was the understanding of the parties that each was to retain the possession of such part of the real estate as he held at the dissolution, accounting for the balance. Yet this was not so satisfactorily established as to warrant the court in acting upon that ground; and besides, so much time has elapsed since the dissolution of the partnership, and such changes in the property have been made, that it would be difficult, if not impracticable, to ascertain the value at the time of the dissolution. Most of the improvements have been made by Elias, and it is Justin who now insists upon the sale of the property; and it would be highly inequitable, under such circumstances, that he should take his share of the property according to its present value, without bearing any of the expense of the improvements. The court does not, therefore, feel disposed to modify the manner in which the accounts in this respect have been taken between the parties; and we do not think we are, upon this point, deviating from the rules and principles adopted in courts of equity, under such special circumstances. With respect, however, to the compensation for personal services which has been taken into the statement of the accounts, the rule appears to be inflexible. No case has fallen under my observation where a compensation has been allowed to one partner against another, without a special agreement for that purpose. It is considered that each joint owner, in taking care of the joint property, is taking care of his own interest, and the law never undertakes to measure and settle between partners their various and unequal services bestowed on their joint business. This must be left to be regulated by special contract, otherwise it is deemed a case of voluntary management. And the same rule applies after the dissolution. Each party becomes, with respect to the property in his hands, a trustee; and it is a well-settled rule, that a voluntary trustee is not entitled to compensation for his personal services; he is entitled to all just allowances for actual charges and expenses in managing the trust, but no more; and this on the principle that the act was voluntary on his part: and the objection to such compensation claimed on the part of Elias, applies with great force in the present case. He was the party who dissolved the partnership, and it was in his power immediately to have settled the partnership concerns, and discharge himself from all care and attention to that which belonged

to his copartner. 15 Ves. 226; 1 Anst. 94; 2 Brown, Ch. 656; 1 Johns. Ch. 38, 165; 2 Johns. Ch. 117; 3 Johns. Ch. 433. All allowances that have been brought into the accounts on either side, for the personal services of either partner, must be stricken out.

The question with respect to costs is not free from difficulty. It is a well-settled rule that costs in chancery rest in the sound discretion of the court under the circumstances of the case, and are not governed by the statutes of costs applicable to common law proceedings. 11 Ves. 458; 1 Johns. Ch. 77, 89, 182. The due exercise of this discretion is often attended with difficulty, particularly when the proceedings have been so various and protracted as in the present case. Justice may require some special order with respect to the costs; and to enable the court to exercise their discretion, with a due regard to justice and equity, it is deemed advisable that a bill of the costs and expenses on each side should be made out and presented to the court, before a final disposition with respect to the cost is made. In relation to the depositions introduced at the last term, with respect to some transactions of Lewis Lyman in the receipt of moneys, and the payment of certain debts in Boston, the court has had considerable difficulty. The testimony is somewhat contradictory, and too obscure to enable the court to come to any satisfactory conclusion respecting it. And considering the great delay in not bringing it forward at an earlier stage of the controversy, we think proper to lay it entirely out of view in closing this transaction.

The cause must now be referred to a commissioner, barely to restate the accounts between the parties, correcting the same in the particulars mentioned in this opinion; and a final decree entered thereupon, except as to the costs, with respect to which the final decree is reserved until the coming in of the accounts of the respective parties, required to be made out and submitted to the court; upon the coming in of which a final decree respecting the costs will be entered as of the last term.